1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETA REYES, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>      vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>        Defendant. | Case No. 8:16-cv-563-AG-AFMx<br><br>Hon. Andrew J. Guilford<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 20, 2017<br>Time: 10:00 a.m.<br>Courtroom: 10D |

# TABLE OF CONTENTS

I.    INTRODUCTION. .................................................................................. 1

II.   STATEMENT OF FACTS. ................................................................... 2

      A.    Experian's history with Western Sky, CashCall and Delbert. ............... 2

      B.    Experian's decision to delete all Western Sky accounts. ........................ 5

      C.    Experian fails to delete the Delbert accounts in December 2014. ............ 6

      D.    Experian fails to delete the Delbert accounts in January 2015 after Delbert went out of business. .................................................................. 7

      E.    Experian fails to correct the mistake after being explicitly notified. .......... 8

      F.    Experian waits four months to take any action and then fails to delete the Delbert accounts on three more occasions. ........................................ 8

      G.    Plaintiff's credit reports. ...................................................................... 10

III.  LEGAL STANDARD. .......................................................................... 12

IV.   ARGUMENT. ....................................................................................... 12

      A.    Plaintiff's December 10, 2015 report contained multiple inaccuracies. ... 13

            1.    Plaintiff's report contained patent errors. ................................... 14

            2.    Plaintiff's report was materially misleading because it selectively reported only the delinquent portion of Plaintiff's loan. .............. 18

      B.    Experian's conduct was willful because its actions and inactions created an unjustifiably high risk of harm that was known or so obvious that it should have been known. .................................................................... 22

V.    CONCLUSION. ................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Akselrod v. Chex Systems, Inc.*,
   No. CV 05-3680-GPS, 2005 WL 1492390 (C.D.Cal. June 6, 2005)......................20

*Alexander v. Moore & Assocs., Inc.*,
   553 F. Supp. 948 (D. Haw. 1982) ...........................................................................21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................12

*Andrews v. Trans Union Corp. Inc.*,
   7 F. Supp. 2d 1056 (C.D. Cal. 1998).................................................................19, 21

*Avetisyan v. Equifax Info. Servs. LLC*,
   No. CV 14-00161-AB (ASX), 2015 WL 12656951 (C.D. Cal. Mar. 25, 2015) .....17

*Boggio v. USAA Fed. Sav. Bank*,
   696 F.3d 611 (6th Cir. 2012)...................................................................................21

*Bradshaw v. BAC Home Loans Servicing, LP*,
   816 F. Supp. 2d 1066 (D. Or. 2011)........................................................................24

*Carvalho v. Equifax Info. Servs., LLC*,
   629 F.3d 876 (9th Cir. 2010).............................................................................passim

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................12

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
   2016 WL 4820635 (C.D. Cal. Aug. 31, 2016).........................................................16

*Dalton v. Capital Assoc'd Indus., Inc.*,
   257 F.3d 409 (4th Cir. 2001)..............................................................................21, 23

*Drew v. Equifax Info. Servs., LLC*,
   690 F.3d 1100 (9th Cir. 2012)..................................................................................15

*Gorman v. Wolpoff & Abramson, LLP*,
   584 F.3d 1147 (9th Cir. 2009)...........................................................................passim

*Grigoryan v. Experian Info. Sols., Inc.*,
   84 F. Supp. 3d 1044 (C.D. Cal. 2014) .....................................................................22

*Guimond v. Trans Union Credit Info., Co.*,
   45 F.3d 1329 (9th Cir. 1995)..............................................................................12, 17

*Heaton v. Soc. Fin., Inc.*,
   2015 WL 6744525, n.5 (N.D. Cal. Nov. 4, 2015)....................................................25

*Koropoulos v. Credit Bureau, Inc.*,
   734 F.2d 37 (D.C. Cir. 1984) .............................................................................19, 20

*Montgomery v. Wells Fargo Bank*,
No. C12-3895 TEH, 2012 WL 5497950 (N.D. Cal. Nov. 13, 2012).....................22

*Pinner v. Schmidt*,
805 F.2d 1258 (5th Cir. 1986)...............................................................................21

*Robins v. Spokeo, Inc.*,
742 F.3d 409 (9th Cir. 2014).................................................................................23

*Safeco Ins. Co. v. Burr*,
551 U.S. 47 (2007) ..........................................................................................22, 23

*Shakur v. Schriro*,
514 F.3d 878 (9th Cir. 2008).................................................................................17

*Shannon v. Equifax Info. Servs., LLC*,
764 F. Supp. 2d 714 (E.D. Pa. 2011) ...................................................................21

*Smith v. HireRight Sols., Inc.*,
711 F. Supp. 2d 426 (E.D. Pa. 2010) ...................................................................14

*Starkey v. Experian Info. Solutions, Inc.*,
32 F. Supp. 3d 1105 (C.D. Cal. 2014)..............................................................15, 24

*Swanson v. Cent. Bank & Trust, Co.*,
2005 WL 1719363, (E.D. Ky. 2005).....................................................................21

*Syed v. M-I, LLC*,
—F.3d —, 2017 WL 242559 (9th Cir. Jan. 20, 2017) .....................................23, 24

*Taylor v. First Advantage Background Servs. Corp*,
2016 WL 4762268 (N.D. Cal. Sept. 13, 2016) .....................................................23

*Valentine v. First Advantage Saferent, Inc.*,
No. EDCV 08-142 VAP, 2009 WL 4349694 (C.D. Cal. Nov. 23, 2009).........passim

*Venugopal v. Digital Federal Credit Union*,
2013 WL 1283436 (N.D. Cal. Mar. 27, 2013)......................................................22

*Wenning v. On-Site Manager, Inc.*,
No. 14 CIV. 9693 (PAE), 2016 WL 3538379 (S.D.N.Y. June 22, 2016) ..............17

*Edwards v. Toys "R" Us*,
527 F. Supp. 2d 1197 (C.D. Cal. 2007).......................................................12, 23, 25

*Yourke v. Experian Info. Solutions, Inc.*,
No. C 06-2370 CW, 2007 WL 1795705 (N.D.Cal. Jun.20, 2007) ...................20, 22

**STATUTES**

15 U.S.C. 1681n(a)(1)(A) ...................................................................................22, 23

15 U.S.C. § 1681e(b) ...................................................................12, 13, 14, 15

**RULES**

Fed. R. Civ. P. 56(a) ...................................................................................12

# I.    INTRODUCTION.

For nearly four years, Experian provided essential services, including access to consumers' credit reports and data reporting services, to enable three of its clients, Western Sky Financial, LLC, CashCall, Inc., and Delbert Services, Inc., to carry out the notorious Western Sky tribal lending scheme. At the height of the scheme, Experian was earning more than $2 million annually from these clients.

By the end of 2013, however, at least 19 state and federal enforcement agencies had taken legal action against Experian's clients. Perhaps fearing legal liability of its own, Experian decided to delete all account data associated with Western Sky loans from consumers' credit reports. But despite making the decision to delete, and despite commencing the process in December 2014, Experian failed to delete more than 125,000 accounts that remained on consumers' reports. Experian was made aware of this problem on multiple occasions, but either ignored it or failed to follow its own procedures to ensure the deletion occurred.

While Experian attempts to characterize its failures as "simple mistakes," there is an extensive factual record that would allow a fact-finder to conclude Experian acted in reckless disregard of its statutory duty to use reasonable procedures to "assure maximum possible accuracy." To establish a violation of § 1681e(b), a plaintiff must first show her report was inaccurate. A credit report is "inaccurate" within the meaning of § 1681e(b) if it is "patently incorrect or materially misleading." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890-91 (9th Cir. 2010).

Contrary to Experian's arguments, Plaintiff is not asserting that her credit report was inaccurate because the underlying loan was "illegal." Nor does Plaintiff assert that Experian had any duty to make a determination as to the "legality" of Plaintiff's loan. Plaintiff contends her report was "materially misleading" for a much more fundamental reason: it contained a negative account that Experian intended to delete one year earlier, and Experian's policies mandate should have been deleted

when the furnisher went out of business the following month, but Experian failed to delete. Plaintiff is separately moving for summary judgment on this basis, and her forthcoming motion for class certification is premised on this inaccuracy. Plaintiff's individual report was also "patently incorrect" because the account included multiple inaccuracies relating to the loan. Accordingly, Plaintiff has established a *prima facie* violation of § 1681e(b) on multiple grounds.

## II.     STATEMENT OF FACTS.

### A. Experian's history with Western Sky, CashCall and Delbert.

Experian is a national consumer reporting agency as defined in Section 1681a(f) of the FCRA. Experian generates and sells consumer reports (often referred to as "credit reports" or "reports"). To compile credit reports, Experian collects information from companies known as "data furnishers." Ex. 1-A.[1] In order to furnish data to Experian, companies must submit a new client application and be approved by Experian's membership department. Ex. 1-B. Experian refers to this process as "onboarding." Ex. 1-C. Once approved, Experian assigns the data furnisher a unique "Vendor ID" and data reporting "subcode." *See* Henke Decl., Doc. 52-25, ¶ 2. Consumers' credit reports can be accessed by "subscribers" that purchase the reports in order to make lending decisions or for other purposes permitted under the FCRA. Exs. 1-D, 1-E, 1-F. Subscribers must also submit a new client application and be approved by Experian in order to access consumers' reports. Ex. 1-D.

In 2003, Experian approved California-based consumer lending company CashCall as a data furnisher and approved it to access consumers' credit reports as a subscriber. *See* Henke Dec., Doc. 52-25, ¶ 2. CashCall's membership application listed the president of the company as John Paul Reddam. Ex. 6. Since 2003, Experian's account manager for CashCall was Richard "Rick" Hills, a member of

---

[1] Unless otherwise noted, all Exhibit ("Ex.") citations are to the exhibits attached to the Declaration of J. Austin Moore ("Moore Dec."), submitted herewith. Exhibits 1-5 are deposition transcripts; and citations in the brief to subsets of Exhibits 1-5 (*e.g.*, Exs. 1-A, 4-C) are intended cross reference specific deposition testimony set forth in the Moore Dec.

Experian's sales department. Exs. 2-A, 2-B, 2-C. Starting in 2006, Mary Cheatham, a senior sales associate within Experian, worked with Rick Hills managing the account. Ex. 3-A. In late 2009, Experian learned that CashCall was changing its business practices in order to expand its consumer lending business nationwide. Exs. 2-D, 3-B. To do this, CashCall partnered with a newly-formed company, Western Sky Financial, LLC, that purported to be associated with an American Indian tribe. Exs. 2-E, 3-B, 3-C. The purpose of this arrangement was to allow CashCall to fund high-interest loans under Western Sky's name while avoiding state licensing and usury laws because Indian tribes are entitled to tribal sovereign immunity. Exs. 2-F, 2-G. CashCall would then purchase the loans back from Western Sky three days later and take over collection on the accounts. Ex. 3-D. Western Sky needed access to consumers' credit reports to make lending decisions, so on January 19, 2010, Western Sky submitted a membership application with Experian, seeking such access. Exs. 2-H, 3-E, 7. Mary Cheatham prepared all the new client documentation on behalf of Western Sky and Experian approved Western Sky as a new client. Ex. 3-E. In 2010, Experian also "onboarded" Delbert as a collection agency. *See* Henke Dec., Doc. 52-25, ¶ 3. Delbert's membership application listed Reddam as the owner and CashCall as its parent company. Ex. 8. From 2010-2013, CashCall funded hundreds of thousands of loans through Western Sky generating $2 million for Experian annually. Ex. 2-I. By early 2013, however, a number of state and federal agencies had filed lawsuits against Western Sky, CashCall, Reddam, and/or their affiliated companies relating to violations of state lending laws and abusive debt collection practices. Ex. 9. Experian was aware of the extensive litigation surrounding its clients related to these loans. Exs. 1-G, 2-J, 3-F, 10. On more than 25 occasions between July 12, 2013 and December 31, 2013, Mr. Hills received "Google alerts" in his email inbox linking him to articles discussing lawsuits filed against CashCall and Reddam. Ex. 11.

In April 2013, Experian conducted a membership review on CashCall. The contents of the review included copies of consumer complaints against CashCall and

a number of articles discussing multi-million dollar settlements between CashCall and various states. Ex. 10. Under the comments section of the review, Experian wrote: "There are many complaints and law suits [sic] against CashCall but nothing difinitive [sic] showing CashCall has broken any laws has been found." *Id.* On August 20, 2013, Experian's membership department performed another membership review on CashCall. This review acknowledged even more of the extensive litigation against CashCall, with the file including annotated copies of multiple legal actions taken against Western Sky and/or CashCall. Ex. 12. On the same date, August 20, 2013, Rick Hills sent an email to senior members within the sales department acknowledging that the allegations describing CashCall and Western Sky's relationship as a "rent-a-tribe" scheme were "essentially correct." Exs. 13, 2-K.

On August 29, 2013, members of Experian's sales department were informed via a *Wall Street Journal* article that Western Sky was ceasing to offer loans amid "interference by state and government regulators." Exs. 2-L, 14. Rick Hills professed "shock" at the news and estimated that Western Sky's decision would cost Experian $1.2 million in revenue for the year 2014. *Id.* During this period, Experian approved Delbert for a new function, to become a loan servicer and agent of CashCall. *See* Henke Dec., Doc. 52-25, ¶ 3. This would allow Delbert, along with CashCall, to report data to Experian relating to Western Sky loans. Ex. 15. At the time Delbert's request was being processed, Experian's membership department was aware of a number of pending lawsuits, court orders, and judgments against CashCall and Delbert relating to the Western Sky scheme. Ex. 1-G. Delbert was assigned a unique data reporting subcode under CashCall's company ID. *See* Cheatham Decl., Doc. 52-23, ¶ 5. In December 2013, three months after Western Sky stopped offering loans, Delbert began reporting a portfolio of 125,746 accounts relating to outstanding Western Sky loans, all of which were previously reported by CashCall. Ex. 17. This meant consumers' reports would contain two accounts relating to their Western Sky loan, one from CashCall and one from Delbert. Ex. 4-A. At least 102,824 of the

accounts reported by Delbert were "past due" or delinquent, meaning they would report as a negative credit item on consumers' reports. Ex. 17, 3-G.

**B. Experian's decision to delete all Western Sky accounts.**

In January 2014, Western Sky entered into a $1.5 million settlement agreement with the State of New York that invalidated more than 18,000 loans. Ex. 18. As a condition of the settlement, Sean Bennett, a representative from CashCall, requested that Experian delete all Western Sky accounts associated with New York borrowers. Exs. 19, 3-H. To capture all borrowers with Western Sky loans, Experian had to delete files reported by both CashCall and Delbert. Ex. 20. Experian later did the same with borrowers from Connecticut, Vermont, and Pennsylvania, and in each instance, Mary Cheatham assisted in deleting both CashCall and Delbert accounts. Exs. 3-K, 21-24. In early 2014, Experian employee Carmen Hearn was informed by David Proctor, an Experian senior vice president, that Experian management was considering deleting all data relating to Western Sky loans and requested that she review the situation. Ex. 5-A, 5-B. At the same time, Experian adopted a new policy for "reinvestigating" consumer disputes relating to CashCall and Delbert. Exs. 25-28. Rather than let CashCall and Delbert decide whether a dispute was valid, as was standard procedure, Experian would instead immediately delete the account. Ex. 5-C.

As part of the review process, Mary Cheatham confirmed that Western Sky loans were being reported by two companies under two separate subcodes, CashCall and Delbert, both reporting under CashCall's company ID. Ex. 29. Because CashCall also reported its own portfolio of accounts in addition to the Western Sky portfolio, Experian's management requested that CashCall assist in "re-subcoding" CashCall's portfolio in order to segregate (and ultimately delete) the Western Sky-originated accounts. Exs. 5-D, 5-E, 21, 30; *see also* Cheatham Dec., Doc. 52-23, ¶ 4. A re-subcode was unnecessary for the Delbert subcode because it only reported Western Sky accounts. Exs. 21, 2-M. On May 30, 2014, Experian's data development department confirmed that the re-subcode was completed and CashCall's portfolio of

359,371 Western Sky accounts would report under the new subcode 2292030. Exs. 30, 3-I. That same month, Experian learned that Western Sky accounts associated with New York borrowers were still reporting on consumers' reports, which frustrated the sales staff. Exs. 31-32, 3-J. Around this period, Experian made the decision to delete all Western Sky accounts. However, after numerous delays precipitated by Experian's sales staff, Experian did not inform CashCall of its intent to delete the accounts until October 2014. Exs. 2-N, 5-F, 5-G, 5-H, 33-35; *see also* Proctor Decl., Doc. 52-28, ¶ 13.

### C. Experian fails to delete the Delbert accounts in December 2014.

On November 24, 2014, Carmen Hearn sent an e-mail outlining assignments to various individuals and departments within Experian to facilitate the deletion of all Western Sky-originated accounts (the "mass deletion"). Ex. 36. Carmen Hearn assigned Mary Cheatham and Rick Hills the task of submitting a Master File Maintenance Report (MFMR), which would "start this process internally" by instructing Experian's data development department to delete the necessary data reporting subcodes. *Id.* Experian maintains procedures for completing a MFMR, which explain the purpose and process for facilitating the deletion of a subcode:

> Purpose of MFMR's: An MFMR completes the cancellation process. The form is sent to the data organization to address data reporting and then is forward [sic] to subcode maintenance for the status of the account to be changed in Customer Master from "H" to "D" or "P." Ex. 37.

The procedures state that a subcode status should be changed to "D" for delete when "the account has no data on file or the company is out of business[.]" *Id.* Mary Cheatham was in charge of submitting the MFMR form necessary to commence the deletions with Rick Hills overseeing the process. Exs. 2-O, 3-L. On December 15, 2014, Debbie Stout, a member of Experian's data development department, acknowledged receipt of the MFMR for the CashCall subcode. Ex. 38. Debbie Stout then sent a "Data Development Notification of Key Action" to at least 15 individuals and two listservs within Experian informing them that "356,902 records reporting

under subcode 2292030, vendor ID DAPNU [CashCall]" were set to delete. Ex. 39. On December 23, 2014, Ingrid Kenneth, Experian's data manager director, sent an email to Carmen Hearn and Mary Cheatham confirming that deletion of CashCall subcode 2292030 had been completed the previous day. Ex. 40. This confirmation was relayed to members of Experian's management and CashCall. Exs. 40-41. Despite claiming an intent to delete all Western Sky accounts at that time, Experian failed to submit a deletion request for the more than 125,000 Western Sky accounts being reported by Delbert under subcode 2245140. Exs. 3-M, 3-N; *see also* Cave Decl., Doc. 52-23, ¶¶ 8, 9.

**D. Experian fails to delete the Delbert accounts in January 2015 after Delbert went out of business.**

Experian's internal guidance to furnishers provides that: "If [reported] accounts cannot be verified on your system then they should be deleted." Exs. 20, 3-O. As such, when an entity furnishing to Experian goes out of business, Experian's policy is to delete all data being reported by that furnisher because it can no longer be verified. Experian's corporate representative Kimberly Cave (f/k/a Hughes) testified:

> A. [If a furnisher is] not an active reporter then I would expect there not to be data on file because that's going to be handled by data development. So if you go out of business and no longer meet requirements for membership we can't keep your data on file. If there's no longer someone responsive to your data I can't keep it on file because in the interest of the consumer I can't verify it at that point. Ex. 4-B.

On January 14, 2015, a representative from Delbert informed Mary Cheatham that effective January 1, 2015, Delbert was no longer in business and wanted to "discontinue use of any and all services provided by Experian" including data furnishing. Ex. 42. Ms. Cheatham responded: "I will take care of this today. We will turn off all existing subscriber codes." Ex. 43. Ms. Cheatham then listed four subcodes under the Delbert company ID and confirmed their cancellation as of January 21, 2015. *Id*. But she failed to include subcode 2245140, the Delbert subcode reporting Western Sky loans under CashCall's company ID. Ex. 3-P.

**E. Experian fails to correct the mistake after being explicitly notified.**

On June 1, 2015, Sean Bennett from CashCall informed Mary Cheatham that he was receiving complaints about Western Sky-originated accounts still reporting. Ex. 44. After Mr. Bennett provided a "bullseye"[2] with eight examples of consumers' reports containing Western Sky accounts, Mary Cheatham requested that Debbie Stout review the bullseyes and identify the problem. Exs. 3-Q, 45.

On June 4, 2015, Debbie Stout responded to Mary Cheatham and Rick Hills identifying two problems. First, some of the re-subcoded CashCall accounts started to re-report; and second, Delbert subcode 2245140 was still reporting because nobody had submitted a MFMR instructing data development to delete the subcode, even though Delbert was listed as "inactive pending" in Experian's systems. Ex. 46. Ms. Cheatham acknowledged this was a serious "reporting error" and "high priority" issue because of the potential impact on consumers and the client. Ex. 3-W.

**F. Experian waits four months to take any action and then fails to delete the Delbert accounts on three more occasions.**

Despite being explicitly informed that the Delbert data was still reporting, neither Ms. Cheatham nor Mr. Hills took any immediate corrective action. Exs. 2-P, 3-S. Ms. Cheatham acknowledged that Experian had no justification for the delay:

> Q. . . . . isn't this the type of issue that would typically become a high priority that needs to get addressed and fixed?
>
> **A. Yes**.
>
> Q. Immediately?
>
> **A. Yes**.
>
> Q. Do you know why it didn't happen in this instance?
>
> **A. Because I dropped the ball**. (Ex. 3-T).

Over the next several months, Sean Bennett of CashCall followed up with Mary Cheatham on at least three occasions asking for confirmation that Western Sky

---

[2] A bullseye allows the furnisher to see how data is being displayed on consumers' reports. *See* Ex. 3-V.

accounts had been deleted, to which Ms. Cheatham did not respond. Exs. 3-R, 47-49. On September 30, 2015, Rhonda Gee from Experian's data department wrote Mary Cheatham an e-mail marked high priority stating: "I was assigned to work the accounts for Western Sky - please let me know which subcode or subcodes require maintenance to delete the accounts." Ex. 50. Again, Ms. Cheatham did not respond.

On October 15, 2015, Experian's data department again followed up and Mary Cheatham finally responded that "We definitely need to stop accepting data from CashCall for the Western Sky subcode, and we'll need to process another delete for those that got through since the original delete." Ex. 51. Mary Cheatham then sent out a calendar invitation with a note stating: "2245140 subcode for Delbert[;] **Submit form to client support MFMR to delete data**." (emphasis in original). Ex. 52.

The data department confirmed that Delbert subcode 2245140 had 125,746 accounts on file and informed Ms. Cheatham that they would "need an MFMR request to delete those trades." Ex. 16. Despite all parties recognizing this was the correct subcode, Ms. Cheatham again instructed data development to delete the four non-Western Sky related subcodes associated with Delbert's company ID that were set to inactive when Delbert went out of business, and again failed to delete the 2245140 subcode. *Id.* On January 8, 2016, Sean Bennett from CashCall again informed Mary Cheatham and Experian employees that Western Sky data was still reporting, now pleading with Experian: "How can we be assured these loans have been deleted?" Ex. 53. Jake Weinberg assured Mr. Bennett: "By tomorrow, 01/15/16, there will no longer be any Western Sky originated accounts on the Experian credit file." *Id.* But the issue surfaced again on March 4, 2016, when Sean Bennett again wrote Experian to say Western Sky accounts were reporting under Delbert's subcode. Ex. 54. Making the same mistake for a third time, Experian instructed that the wrong Delbert subcodes be deleted; and not the subcode reporting Western Sky loans. *Id.*

In 2015 and 2016, Experian's disputes department received 1,925 disputes from consumers relating to Delbert accounts. Ex. 55. Nobody from Experian's

disputes department inquired as to why disputes were coming in on accounts that should have been deleted years prior. Ex. 4-C. The deletion of Delbert accounts did not actually take place until April 2016, almost two years after Experian made the decision to delete and nearly two months after this action was filed. Ex. 3-U.

### G. Plaintiff's credit reports.

On or about November 27, 2012, Plaintiff took out an online loan from Western Sky in the amount of $2,525. *See* Decl. of Demeta Reyes in Opp. to Summ. Judg., ("Reyes Decl."), ¶ 1. Under the terms of the loan agreement, the disclosed annual interest rate on the loan was 138.91% and the finance charge on the loan was $11,353.62. *Id.*, ¶ 3; Ex. 56. From January 2013 through March 2014, Plaintiff made 16 payments to CashCall and Delbert totaling $4,809.85. *Id.*, ¶ 3; Ex. 57. On October 29, 2014, Experian generated a credit report (Ex. 58) (that Plaintiff did not receive *see* Doc. 52-4 at 60:13-61:6) containing a positive CashCall account reflecting Plaintiff's payment history on the WS loan from Dec. 2012 through July 2013:

■ **Credit items**

| CASHCALL INC<br>1 CITY BLVD W<br>ORANGE CA 92868<br>No phone number available<br>Partial account number<br>2347....<br>Address Identification number<br>0410236994<br>Sold to: CONSUMER LOAN TRUST | Date opened<br>Nov 2012<br>First reported<br>Dec 2013<br>Date of status<br>Aug 2013 | Type<br>Unsecured<br>Terms<br>47 Months<br>Monthly<br>payment<br>Not reported | Credit limit or<br>original amount<br>$2,600<br>High balance<br>Not reported | Recent balance<br>Not reported | Responsibility<br>Individual<br>Status<br>Closed/Never late.<br>This account is scheduled to continue on record until Aug 2023.<br>Comment:<br>Purchased by another lender. |

Payment history
2013                                              2012
AUG JUL JUN MAY APR MAR FEB JAN DEC
CLS OK OK OK OK OK OK OK OK

It also included a negative Delbert account reflecting Plaintiff's payment history on the same WS loan from December 2013 through September 2014 (Ex. 58):

| DELBERT SERVICES/CONSUME<br>RODNEY SQUARE N 1100 N MKTST<br>WILMINGTON DE 18901<br>No phone number available<br>Partial account number<br>2347....<br>Address identification number<br>0549096576<br>Purchased from CASHCALL INC | Date opened<br>Aug 2013<br>First reported<br>Dec 2013<br>Date of status<br>Sep 2014 | Type<br>Unsecured<br>Terms<br>47 Months<br>Monthly<br>payment<br>Not reported | Credit limit or<br>original amount<br>$2,600<br>High balance<br>Not reported | Recent balance<br>$1,512 as of Sep 2014 | Responsibility<br>Individual<br>Status<br>Account charged off. $1,512 written off. $1,588 past due as of Sep 2014.<br>This account is scheduled to continue on record until Feb 2021. |

Your accounts that may be considered negative (continued)

Payment history
2014                                              2013
SEP AUG JUL JUN MAY APR MAR FEB JAN DEC
CO 120 90 60 30 OK OK OK OK OK

Account history - If your creditor reported your account balances to us, we list them in this section as additional information about your account. Your balance history may also include your credit limit and high balance or the original loan amount for an installment loan. This section also includes the scheduled payment amounts, amounts actually paid and the dates those payments were made. ND: No Data.

|  | **AB** = Account balance ($) | | | | **DPR** = Date payment received | | | **SPA** = Scheduled payment amount ($) | | **AAP** = Actual amount paid ($) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Aug14 | Jul14 | Jun14 | May14 | Apr14 | Mar14 | Feb14 | Jan14 | Dec13 |
| AB | 1,512 | 1,512 | 1,512 | 1,512 | 1,512 | 1,624 | 1,624 | 1,815 | 1,815 |
| DPR | | Mar15 | Mar15 | Mar15 | Mar15 | Mar15 | Dec15 | Dec15 | Nov03 |
| SPA | | 294 | 294 | 294 | 294 | 294 | 294 | 294 | 294 |
| AAP | ND | ND | ND | ND | ND | ND | 167 | ND | 293 |
► The original amount of this account was $2,600

After Experian's mass deletion in December 2014, the positive CashCall account was deleted from Plaintiff's report, but the negative Delbert account showing the Western Sky loan as "past due" remained. This was reflected on Plaintiff's December 10, 2015 report, which contained only the negative Delbert account. Ex. 59. After analyzing her reports, Plaintiff's expert Dean Binder concluded that under the FICO scoring model, both the deletion of the positive CashCall account and the presence of the negative Delbert account had negative scoring impacts on Plaintiff's FICO credit score. *See* Ex. 60 at 27-30. In addition, Plaintiff's report contained multiple inaccuracies relating to the Delbert account. At the time she went delinquent, Plaintiff's account balance was at or about $2,446.50. Reyes Decl., ¶ 6, Ex. B. On May 20, 2014, Plaintiff received a "loan modification offer" from Delbert stating her account balance as $1512.84 and offering to lower the interest rate from 135% to 89% while extending the maturity date of the loan. Reyes Decl., ¶ 7, Ex. C. Plaintiff believed this to be a form collection letter because it contained numerous inaccuracies including an inaccurate account balance ($2,446.50, not $1,512.84), interest rate (138.91%, not 135%), and maturity date (11/1/16, not 12/1/14). *Id.*, ¶ 8.

On August 2, 2014, Plaintiff received another letter from Delbert stating that her total amount due was "$2,326.13." In the same communication, Delbert asserted that Plaintiff owed 8 payments of $294.46 "which adds up to $2,355.68." Reyes Decl., Ex. D and ¶ 10. These amounts were not only inconsistent with each other, but also inconsistent with the correspondence Plaintiff received in May 2014, and the actual terms of her loan agreement and amortization schedule. *Id.*, ¶ 10.

Plaintiff's report reflected this inaccurate information relating to her Delbert account. Exs. 58, 59. It reported the original amount of the loan as "$2,600" rather than "$2,525"; it reported Plaintiff's "recent balance" as "$1,512 as of Sept. 2014" which was inconsistent with what Delbert represented in the August 2, 2014 letter and the actual terms of Plaintiff's loan agreement and amortization schedule. *Id.*; Reyes Dec., ¶ 11. It reported the "status" of the account as "Account charged off.

$1,512 written off" and "$1,588 past due as of Sep. 2014." The "past due" amount was inconsistent with the purported "recent balance" and "written off" amounts. And in the payment history grid, Plaintiff's account balance was reported as "$1,815" in December 2013 and January 2014, "$1,624" in February and March 2014, and "$1,512" in April through August 2014, which were all inconsistent with the loan terms and amortization schedule. Exs. 58, 59; Reyes Dec., ¶ 11.

## III.   LEGAL STANDARD.

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986), and the court must "resolve all factual disputes and draw all inferences in favor of the non-moving party." *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1209 (C.D. Cal. 2007). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## IV.   ARGUMENT.

Plaintiff asserts a one-count claim against Experian for violating section 1681e(b) of the FCRA, which requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). "In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information." *Guimond v. Trans Union Credit Info., Co*., 45 F.3d 1329, 1333 (9th Cir. 1995). Once established, "[t]he reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." *Id*. A report is "inaccurate" within

the meaning of § 1681e(b) if it is "patently incorrect or materially misleading." *Carvalho*, 629 F.3d at 890-91. Information on a report is "materially misleading" if it is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Carvalho*, 629 F.3d at 890 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)).

### A. Plaintiff's December 10, 2015 report contained multiple inaccuracies.

Plaintiff's December 10, 2015 Experian report was inaccurate and/or materially misleading within the meaning of § 1681e(b) in five independent ways: (1) it was materially misleading because it contained an account that Experian made the decision to delete but Experian failed to execute the deletion; (2) it contained an account that Experian's policies mandate should have been deleted when Delbert went out of business – and Delbert instructed Experian to cancel all services – but Experian failed to execute the deletion; (3) it contained an account that Experian made the decision to delete *and* Experian's policies mandate should have been deleted when Delbert went out of business but Experian failed to execute the deletion; (4) it selectively reported only the delinquent portion of Plaintiff's loan in a manner that could be expected to adversely affect credit decisions; and (5) Plaintiff's report was "patently incorrect" because it contained an inaccurate recent loan balance, original loan amount, amount charged off and past due, and balance history.

Plaintiff is intending to move for summary judgment on the first four "materially misleading" inaccuracies set forth above and will address those in her anticipated forthcoming motion.[3] Experian moves for summary judgment only on the fourth and fifth inaccuracies, which Plaintiff will respond to here. Importantly, Plaintiff does not assert that her report was inaccurate because the underlying loan was illegal under state law. As such, Experian's lengthy discussion on Georgia law and the rule set forth in *Carvalho* (*see* Doc. 52-1, 13-16) have no bearing on whether

---

[3] The Court's scheduling order provides that Plaintiff's motion for summary judgment and motion for class certification are t February 24, 2017. *See* Doc. 29.

Plaintiff has made a *prima facie* showing of inaccuracy under § 1681e(b).

### 1. Plaintiff's report contained patent errors.

Plaintiff has submitted a declaration showing her account balance was at or about $2,446.50 when she first went delinquent. The Delbert account on her report, however, reported an incorrect account balance of $1,512, original loan amount of $2,600, "past due" amount ($1,588), "written off" amount ($1,512), and an inaccurate payment history grid. The presence of multiple "patent errors" on Plaintiff's report is an invasion of her legally protected interest to a report prepared using reasonable procedures to assure maximum possible accuracy under the FCRA and satisfies her threshold showing of "inaccuracy" under § 1681e(b). Experian argues the reported $1,512 balance amount was consistent with what Delbert told Plaintiff in a May 2014 communication. But as set forth in Plaintiff's declaration, there was no factual basis for this amount—it was inconsistent with the terms of Plaintiff's loan and even Delbert's subsequent communications to Plaintiff.

Experian makes two non-persuasive arguments on this point. First, it contends that reporting a *lower* account balance history than Plaintiff's actual account balance would "not be expected to adversely affect credit decisions." But Experian is conflating the "patently incorrect" standard with the "materially misleading" standard, either of which independently establishes an inaccuracy within the meaning of § 1681e(b). *See Carvalho*, 629 F.3d at 890-91 (A credit report is "inaccurate" within the meaning of § 1681e(b) if it is "patently incorrect **or** materially misleading.") (emphasis added). As such, the existence of a patent error alone satisfies the threshold burden of establishing an inaccuracy. *See Smith v. HireRight Sols., Inc.*, 711 F. Supp. 2d 426, 434 (E.D. Pa. 2010) ("As a general rule, a plaintiff may present his case to the jury on the issue of reasonable procedures merely by showing an inaccuracy in the consumer report and nothing more.").

In *Carvalho*, for example, the plaintiff argued that while her report was technically correct, it contained a *latent* inaccuracy because she was not "legally

obligated" to pay the medical debt at issue. The court rejected this argument, giving examples to distinguish *latent* inaccuracies from *patent* errors, including an account balance reporting as "too high or low." *See Carvalho*, 629 F.3d at 890-91 (plaintiff "does not contend that the . . . account does not pertain to her, ***that the amount past due is too high or low***, or that any of the listed dates are wrong." (emphasis added)). By presenting evidence that her Delbert account contained patent errors, Plaintiff has met her threshold burden of establishing an inaccuracy under § 1681e(b). *See, e.g., Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1108 (9th Cir. 2012) ("our precedent suggests that, at the very least, information that is inaccurate 'on its face,' is 'patently incorrect.'").

Second, Experian argues that "it is neither expected or required to have clairvoyance regarding the true balance amounts or charge-off amounts for each individual tradeline reported to it." But this argument goes to factual question of whether Experian's procedures are *reasonable* to assure maximum possible accuracy, not the initial determination of whether the report *contains* an inaccuracy. Indeed, the *source* of the inaccurate information has no bearing on the threshold question of whether an inaccuracy exists. *See, e.g., Starkey v. Experian Info. Solutions, Inc*., 32 F. Supp. 3d 1105, 1109 (C.D. Cal. 2014) ("No matter how many times 'patently incorrect' information is accurately reproduced, it remains incorrect, and therefore 'inaccurate' under the FCRA."). Having pointed to the existence of "patent errors" (or at least a genuine issue of material fact regarding their existence), this Court can consider whether Experian's procedures were reasonable as a matter of law. In cases of patent errors, this Court has held that a CRA will not be liable for reporting inaccurate information it "received from a source that it reasonably believes to be reputable, and which is credible on its face." *Valentine v. First Advantage Saferent, Inc*., No. EDCV 08-142 VAP, 2009 WL 4349694, at *12 (C.D. Cal. Nov. 23, 2009).

While Experian acknowledges this standard, it argues that it would have had to make a legal determination that the loans were illegal in order to reasonably believe

CashCall and Delbert were not "reputable." *See* Doc. 52-1 at 20. But Experian cites no authority for this puzzling position. Merriam Webster defines "reputable" as "enjoying good repute; held in esteem." Here, the record is replete with examples that Western Sky, CashCall and Delbert were widely-viewed as the exact opposite— unscrupulous entities under a perpetual cloud of state and federal enforcement actions accusing them of operating a sham "rent-a-tribe" lending program and other illegal conduct. *C.f., Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016) (finding consumers were likely to be misled by "the false impression created by CashCall's and Delbert Services' conduct" and the "intentionally complicated and sham structure of the Western Sky loan program").

Experian's awareness of *allegations* of misconduct alone could lead a jury to conclude that Experian should not have reasonably believed these companies were "reputable" and accepted their data at face value.[4] As noted by Plaintiff's expert: "Companies accused of violating the laws with respect to consumer lending and debt collection are less likely to be reputable sources of information because they may be furnishing data for the purpose of gaining leverage in debt collection rather than accurately reflecting a consumer's credit risk." Ex. 60 at 15.

Experian tries to argue a negative—that because there is "no evidence of systematic problems" with Delbert's reported data that Delbert should be considered reputable. But Experian would not learn of "systematic problems" unless it actually audited the data, which Experian never did. As Plaintiff's expert concluded, once the reputation of these companies was brought into question: "Experian could have revised its procedures to require CashCall and Delbert to provide documentation

---

[4] This is further supported by the fact Experian took the nearly unprecedented action of deleting CashCall and Delbert accounts as soon as they disputed by a consumer, without first relaying the dispute to CashCall and Delbert for review. This deviated from standard procedure for reinvestigating disputes and could lead a jury could conclude that Experian was doubtful CashCall and Delbert could or would accurately correct errors in their reporting.

establishing that the reported data was consistent with underlying loan documents and balance sheets, or required regular audits of the furnished data to determine its accuracy." Ex. 60, at 16. By failing to do so, a jury could find that Experian did not employ reasonable procedures to assure maximum possible accuracy of information being reported by Delbert.

Moreover, the ultimate burden of proof is on *Experian*, not Plaintiff, to prove that its procedures were reasonable. *See Guimond*, 45 F.3d at 1333 (holding that once a plaintiff shows that her credit report is inaccurate, the only way a CRA "can escape liability [is] if *it* establishes that its procedures" were reasonable) (emphasis added); *see also Wenning v. On-Site Manager, Inc.*, No. 14 CIV. 9693 (PAE), 2016 WL 3538379, at *16 (S.D.N.Y. June 22, 2016) (citing *Guimond* in concluding that the Ninth Circuit has adopted a "plaintiff-friendly approach in which a plaintiff's demonstration of inaccuracies shifts the onus to the defense" to prove reasonable procedures).[5] To satisfy its burden at summary judgment, a moving party with the ultimate burden of persuasion at trial (as Experian has here for purposes of demonstrating its procedures were reasonable) "must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (citation omitted). Experian's reference to a purported *lack of evidence* falls well short of its burden on summary judgment, particularly where the reputability of the company is not uncontested. *See Valentine*, 2009 WL 4349694, at *12 (lack of record evidence regarding credibility of furnisher precludes summary judgment on reasonableness of CRA's procedures).

---

[5] Plaintiff acknowledges that some Courts in this Circuit have looked past the plain language of *Guimond* to conclude that the burden of proving reasonable procedures does not shift to the defendant once a plaintiff has satisfied her initial burden of showing an inaccuracy. *See, e.g., Avetisyan v. Equifax Info. Servs. LLC*, No. CV 14-00161-AB (ASX), 2015 WL 12656951, at *6 (C.D. Cal. Mar. 25, 2015). But even those courts emphasize that while the burden remains on the plaintiff, the plaintiff's burden is "*so minimal*" that the "reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." *Id.* (citing *Guimond*, 45 F.4d at 1333). Plaintiff has adduced more than enough evidence to satisfy a "so minimal" burden.

### 2. Plaintiff's report was materially misleading because it selectively reported only the delinquent portion of Plaintiff's loan.

Notwithstanding the existence of a patent error, Plaintiff's December 10, 2015 Experian report was separately materially misleading under § 1681e(b) because Experian selectively reported only the delinquent portion of Plaintiff's WS loan.

For example, Plaintiff's October 29, 2014 Experian report contains two accounts relating to her Western Sky loan: (1) a "good standing" account from CashCall that includes Plaintiff's timely payment history on the Western Sky loan from December 2012 to July 2013 (listing the account as closed and sold in August 2013); and (2) a "negative standing" Delbert account documenting Plaintiff's timely and delinquent payment history on the same loan from December 2013 through September 2014. While Plaintiff contends there were patent errors regarding the account as noted above, at the very least a third party making credit decisions would have the benefit of considering Plaintiff's timely payments made on the loan in conjunction with her subsequent delinquency.

In December 2014, Experian intended to delete all accounts originating from Western Sky reported by both CashCall and Delbert. But Experian deleted only the CashCall accounts, and failed to delete the Delbert accounts. The following month, Delbert informed Experian that effective January 1, 2015, it was no longer in business and instructed Experian to "discontinue use of any and all services provided by Experian." Experian violated its own policy by again failing to delete the Delbert subcode reporting Western Sky loans. As a result, when Plaintiff's report was prepared by Experian on December 10, 2015, it included only the negative standing Delbert account, and omitted the positive CashCall account relating to the same loan.

Plaintiff's expert concluded that the deletion of Plaintiff's beneficial CashCall account and the presence of the negative Delbert account had a negative scoring impact on Plaintiff's FICO score. Indeed, a third party making a lending decision would not have the benefit of Plaintiff's full payment history, and thus would not be

able to accurately assess the risk of extending Plaintiff credit. There is no question, therefore, that Experian's reporting was "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Carvalho*, 629 F.3d at 890. Plaintiff will separately move for summary judgment on this basis.

Experian's only argument with respect to this inaccuracy is that the FCRA regulates items that actually appear on credit reports, not items that exist in the CRA's file but were not actually reported. (Doc. 52-1 at 18). But this statement is directly contradicted by a long line of cases holding that an omission of relevant information can make a report materially misleading under the FCRA, especially when the CRA is put on notice of the additional clarifying information.

The seminal case on this point is *Koropoulos v. Credit Bureau, Inc*., 734 F.2d 37 (D.C. Cir. 1984), which has been cited approvingly by this Court and the Ninth Circuit.[6] In *Koropoulos*, the plaintiff defaulted on an installment loan, which the bank later charged off its books as a bad debt and referred to a collection agency. The plaintiff subsequently paid off the debt to the collection agency, which retained 40% of the sum as a collection fee. After the debt was paid, the defendant CRA reported the status of the account as a bad debt with a zero balance. 734 F.2d at 38. The plaintiff alleged that the characterization of the loan in his report was sufficiently incomplete and misleading to constitute an inaccuracy under § 1681e(b) because it indicated to potential creditors that the debt was written off as a total loss and never paid. *See id*. at 38-39. The court acknowledged that although the debt characterization in the report was technically true, "reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports." *Id*. at 40. The court distinguished

---

[6] *See, e.g., Gorman*, 584 F.3d at 1163 (citing *Koropoulos* for proposition that "reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer"); *Valentine*, 2009 WL 4349694, at *8 (same); *see also Andrews v. Trans Union Corp. Inc*., 7 F. Supp. 2d 1056, 1074 (C.D. Cal. 1998), *rev'd in part on other grounds*.

between cases where "the additional information necessary for clarification would have required the agencies to conduct further investigations, a burden that the courts may have considered unreasonable" and the case at hand, where the CRA already had in its possession the additional clarifying information. *See id*., at 41. Accordingly, the court reversed summary judgment in the CRA's favor finding an issue of material fact as to whether the omission was misleading.

This Court reached a similar conclusion in *Valentine*. There, the plaintiff alleged that his report was inaccurate a under § 1681e(b) because it included the "technically correct" notation that an unlawful detainer action had been filed against him, but omitted a clarifying statement that the case was later dismissed. *See id*., at *7-8. While the CRA argued that the report did not contain an inaccuracy because the fact an action was filed was "technically correct," the Court held that the omission of the clarifying information could serve as the basis for a § 1681e(b) claim:

> A technically correct report can still be "inaccurate" under § 1681e(b), though. The leading case on this issue comes from the Court of Appeals for the D.C. Circuit, [citing *Koropoulos*]. Relying on a close reading of the various sections of the FCRA and its legislative history, the court there held that § 1681e(b) makes a credit reporting agency liable for "reports containing factually correct information that nonetheless mislead their readers." *See also Yourke v. Experian Info. Solutions, Inc*., No. C 06-2370 CW, 2007 WL 1795705, at *4 (N.D.Cal. Jun.20, 2007) (adopting *Koropoulos*); *Akselrod v. Chex Systems, Inc*., No. CV 05-3680-GPS, 2005 WL 1492390, at *4 (C.D.Cal. June 6, 2005) (same). The Ninth Circuit recently adopted the reasoning in *Koropolous* in defining an "inaccuracy" under another provision of the FCRA[.] [citing *Gorman*, 584 F.3d 1147 (9th Cir. 2009)].

*Valentine*, 2009 WL 4349694, at *8.

In *Valentine*, the Court concluded that there was a factual question as to whether the notation "CASE FILED" omitting that the case was dismissed would be expected to adversely affect credit decisions. *Id*., at *8. The Court acknowledged that whether an omission is "'misleading in such a way and to such an extent that it can be expected to have an adverse effect,' and thus is an 'inaccuracy,' is generally a

question for the jury." *Id.* (citations omitted). *See also Andrews*, 7 F. Supp. 2d at 1074 (material question of fact whether report was "technically accurate yet misleading" when CRA reported two accounts relating to the same creditor on plaintiff's report).

The three out-of-circuit cases cited by Experian stand for the unremarkable proposition that CRAs are not *statutorily required* to report all information they receive, but that does not mean CRAs are insulated from liability when they omit information that makes a report materially misleading in some respect.[7] *See* Doc. 52-1 at 18. Indeed, many courts have recognized that an inaccuracy under § 1681e(b) can be premised on the omission of information from a consumer's report. *See, e.g., Dalton v. Capital Assoc'd Indus., Inc.*, 257 F.3d 409, 415-16 (4th Cir. 2001) (genuine issue of material fact where jury could reasonably interpret report as indicating that plaintiff was convicted of a felony rather than a misdemeanor); *Pinner v. Schmidt*, 805 F.2d 1258, 1262-63 (5th Cir. 1986) (finding that the statement "litigation pending" on a plaintiffs credit report could have been interpreted as indicating that a furnisher brought a suit against the plaintiff, when the reverse was accurate); *Shannon v. Equifax Info. Servs., LLC*, 764 F. Supp. 2d 714, 722 (E.D. Pa. 2011) (technically correct notation on plaintiff's credit report that he had not paid a telephone bill could create inaccurate "impression that Plaintiff never even attempted to pay his bill, even though Plaintiff had in fact mailed a check to cover the debt"); *Alexander v. Moore & Assocs., Inc.*, 553 F. Supp. 948, 951-52 (D. Haw. 1982) ("misleading nature" of report weighed against "the ease with which this clarifying information [was] made available" to CRA resulted in violation of § 1681e(b) as a matter of law).[8]

---

[7] Experian's citation to the unpublished decision *Swanson v. Cent. Bank & Trust, Co.*, 2005 WL 1719363, (E.D. Ky. 2005) for the proposition that an incomplete and misleading report does not constitute an inaccuracy is arguably not good law in light of the Sixth Circuit's decision in *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012) (collecting cases for proposition that that "omission of information can render information provided 'incomplete or inaccurate'" under FCRA). In any event, this holding has been expressly rejected by the Ninth Circuit. *See, e.g., Gorman*, 584 F.3d at 1163.

[8] Courts in this circuit have also recognized this principle with respect to other provisions of the FCRA requiring a threshold showing of inaccuracy. Because "[c]ourts have applied the

Finally, Experian argues that Plaintiff is taking "two diametrically opposed positions" in arguing that Experian should have deleted the Western Sky accounts earlier while at the same time arguing that deleting positive accounts can create a materially misleading report. *See* Doc. 52-1 at 19, fn. 6. This misstates Plaintiff's position. Plaintiff contends only that when Experian *made* the decision to delete all Western Sky accounts, it should have properly *executed the deletion* of the CashCall and Delbert accounts. Because Experian knew consumer reports with Delbert accounts also reported CashCall accounts relating to the same loan, it was on notice that deletion of only one or the other would create an incomplete report that would not accurately reflect a consumer's payment history.

## B. Experian's conduct was willful because its actions and inactions created an unjustifiably high risk of harm that was known or so obvious that it should have been known.

Under § 1681n, where a defendant "willfully" violates the FCRA, a plaintiff may seek statutory and punitive damages. 15 U.S.C. 1681n(a)(1)(A). A willful violation includes both knowing violations and actions in "reckless disregard of a requirement" of the FCRA. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56-58, 71 (2007). A defendant's action or inaction is reckless if it creates "an unjustifiably high

---

'patently incorrect or materially misleading' standard indiscriminately to claims arising under provisions of the FCRA . . . that involve the accuracy of information" *Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1066-67 (C.D. Cal. 2014), these cases are also persuasive. *See, e.g., Gorman*, 584 F.3d at 1163 (finding that a furnisher could be held liable under the FCRA where furnisher accurately reported an account as "delinquent" but failed to note that the consumer had disputed the debt); *Montgomery v. Wells Fargo Bank*, No. C12-3895 TEH, 2012 WL 5497950, at *5 (N.D. Cal. Nov. 13, 2012) ("Even if Wells Fargo's reporting of Montgomery's debt as 'charged off' was technically accurate, it might still be misleading or incomplete."); *Yourke*, 2007 WL 1795705, at *7 (furnisher's accurate statement that five tax liens had been released against plaintiff without clarifying statement that liens were released for little or no money made report misleading because "[a] creditor who saw a tax lien filed for a large amount and released could reasonably believe that [plaintiff] had in fact failed to pay that amount in taxes."); *Venugopal v. Digital Federal Credit Union*, 2013 WL 1283436 (N.D. Cal. Mar. 27, 2013) (reporting of historically accurate debt may violate the FCRA when furnisher was made aware but did not report that debt was discharged in bankruptcy).

risk of harm that is either known or so obvious that it should be known." *Id*. at 68.[9]

The undisputed facts in this case overwhelmingly support a conclusion that Experian ran an "unjustifiably high risk of violating the statute." *Syed v. M-I, LLC*, — F.3d —, 2017 WL 242559, at *8-9 (9th Cir. Jan. 20, 2017) (citing *Safeco*, 551 U.S. at 70). Here, Experian admits it made "mistakes" in failing to delete the Delbert accounts, but argues those mistakes were merely "careless" acts by an employee that do not rise to the level of willfulness. Experian's characterization of its conduct seems to suggest that willfulness requires proof of a *specific intent* to cause harm. But that interpretation was expressly rejected by the Supreme Court in *Safeco. See Safeco*, 551 U.S. at 57 (willful violation includes actions taken in reckless disregard of statutory requirement); *see also Taylor v. First Advantage Background Servs. Corp*, 2016 WL 4762268, at *12 (N.D. Cal. Sept. 13, 2016) ("statutory requirement of willfulness does not require proof of an intent to cause harm"); *Dalton*, 257 F.3d at 418 ("A showing of malice or evil motive is not required to prove willfulness under the [FCRA]"). Moreover, the record clearly suggests more than "a series of inadvertent mistakes" (Doc. 52-1 at 1)—particularly where Experian employees were explicitly informed of data reporting issues and failed to take any action, or failed to take reasonable actions to correct the problem.

This is precisely why "willfulness under the FCRA is generally a question of fact for the jury." *Edwards*, 527 F. Supp. 2d at 1209 (rejecting defendant's argument that printing extra credit card numbers on customers' receipts was not willful as matter of law because reasonable jury could conclude that the defendant's procedures and "monitoring processes in place (or lack thereof)" created an "unjustifiably high risk" that defendant would violate statute); *Taylor*, 2016 WL 4762268, at *10-12

---

[9] Actual damages are not required where FCRA violations are willful. *See Robins v. Spokeo, Inc.*, 742 F.3d 409, 412–13 (9th Cir. 2014) (the FCRA "does not require a showing of actual harm when a plaintiff sues for willful violations"), *vacated and remanded on other grounds*. If a plaintiff can prove a willful violation of the FCRA, the plaintiff will be entitled to statutory damages of $100 to $1,000 for each such violation. 15 U.S.C. § 1681n(a)(1)(A).

(rejecting CRA's argument that its conduct was not willful because CRA received information from "presumptively reliable source" because reasonable jury could conclude CRA created "an unjustifiably high risk of harm" by accepting information from third-party sources); *Valentine*, 2009 WL 4349694, at *12 (declining to grant summary judgment on willfulness where the CRA "provide[d] no evidence on the record as to the reputation of [the furnisher] or the credibility of its work."); *Starkey*, 32 F. Supp. 3d at 1111 (finding question of whether CRA acted willfully in preparing report that included certain information not provided by other credit bureaus was for the jury); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1076 (D. Or. 2011) (denying summary judgment on willfulness where defendants used "an automated system" to comply with FCRA obligations); *Syed*, 2017 WL 242559, at *8-9 (concluding that act of tying waiver of liability to applicant's employment authorization was willful as matter of law).

Experian's conduct in this case is exponentially more reckless than any of the cases cited above and perhaps any other FCRA case on record. Indeed, a reasonable jury could conclude that Experian created an "unjustifiably high risk of harm" by: (1) accepting information from CashCall and Delbert at face value despite Experian's awareness of extensive legal action taken against the companies indicating they may not be reputable sources of information; (2) making the decision to delete all Western Sky-originated accounts but failing to follow its own procedures to properly delete the Delbert subcode; (3) failing to delete the Delbert accounts once Delbert informed Experian it was no longer in business and instructed Experian to discontinue all services in violation of Experian's own policy; (4) receiving examples of Western Sky accounts still reporting in June 2015 and taking no action whatsoever for more than four months; (5) submitting the wrong subcodes for deletion in October 2015 despite Experian employees acknowledging the correct subcode that needed to be deleted; (6) receiving examples of Western Sky accounts still reporting in January 2016 and again failing to properly correct the error; (7) receiving examples of

Western Sky accounts still reporting in March 2016 and again submitting the wrong subcodes for deletion; (8) receiving nearly 2,000 disputes regarding Delbert accounts *after* they were supposed to be deleted indicating that Experian's processes for communicating between departments was non-existent; and (9) not actually commencing the deletion until after Plaintiff filed suit, indicating Experian's processes for monitoring "deleted" subcodes created unjustifiably high risk of harm.

Any one of these single events alone could lead a jury to determine that Experian's conduct rose above a level of mere carelessness, but considered in their entirety, there is certainly no basis to conclude that "***no reasonable jury*** could find that [Experian's] conduct created a risk of violation substantially greater than that which is necessary to make its conduct negligent." *Edwards*, 527 F. Supp. 2d at 1209.

Finally, Experian's reliance on the "admission" of Plaintiff's expert that Experian's conduct was not willful is unpersuasive and irrelevant. Mr. Binder testified throughout his deposition that he was not offering an opinion as to the "willfulness" of Experian's conduct under the FCRA. *See*, *e.g.,* Doc. 52-18, Binder Depo., 143:12-15; 156:19-157:1-2, 11-12; 209:2-14; 229:3-18. Moreover, Mr. Binder is not an attorney and is not qualified to make a legal determination as to whether Experian's conduct was "willful" as that term is legally interpreted under the FCRA. That is a determination reserved for a jury. *See, e.g., Heaton v. Soc. Fin., Inc.*, 2015 WL 6744525, at *6, n.5 (N.D. Cal. Nov. 4, 2015) ("The mixed nature of the willfulness inquiry—with issues of law and fact intertwined—is the precise reason the question is best reserved for a finder of fact.").

## V.    CONCLUSION.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Experian's motion for summary judgment.

Dated: February 17, 2017,

By:   /s/ Norman E. Siegel
       Norman E. Siegel (*pro hac vice*)
       J. Austin Moore (*pro hac vice*)
       STUEVE SIEGEL HANSON LLP
       460 Nichols Road, Suite 200
       Kansas City, MO 64112
       Tel: 816-714-7100
       Fax: 816-714-7101
       siegel@stuevesiegel.com
       moore@stuevesiegel.com

       Jason S. Hartley (CA Bar No. 192514)
       STUEVE SIEGEL HANSON LLP
       550 West C Street, Suite 1750
       San Diego, CA 92101
       Tel: 619-400-5822
       Fax: 619-400-5832
       hartley@stuevesiegel.com

       *Attorneys for Plaintiff and the Class*